No. 23-1303

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff/Appellee,

v.

JESSICA SPAYD,

Defendant/Appellant.

On Appeal from the United States District Court
for the District of Alaska
No. 3:19-cr-00111-JMK
Hon. Joshua M. Kindred

APPELLEE'S ANSWERING BRIEF

S. LANE TUCKER
United States Attorney
District of Alaska

STEPHEN L. CORSO
Assistant United States Attorney
222 West 7th Avenue, #9, Room 253
Anchorage, AK 99513-7567
Telephone: (907) 271-5071
Fax: (907) 271-1500

*Attorneys for Appellee*
United States of America

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ v

INTRODUCTION .................................................................................... 1

STATEMENT OF JURISDICTION & BAIL STATUS ............................ 2

STATEMENT OF THE ISSUES PRESENTED ...................................... 2

STATEMENT OF THE CASE .................................................................. 3

    A.    Facts ............................................................................... 3

           1.  Spayd starts her pain management clinic.......................... 3

           2.  Spayd abandons practice standards. .................................. 4

           3.  Spayd falsifies medical records.......................................... 7

           4.  Spayd's practices alarm her employees. ......................... 10

           5.  Spayd's prescriptions alarm pharmacists. ...................... 11

           6.  Spayd's prescriptions alarm doctors................................ 14

           7.  Spayd's patients die of overdoses..................................... 16

           8.  Spayd prescribes opioids to an undercover agent. ........... 20

           9.  Spayd is arrested. ............................................................ 22

    B.    Procedural History ...................................................... 24

           1.  Spayd is charged in a superseding indictment. ............... 24

           2.  The district court denies Spayd's motion to exclude testimony from Dr. King. .................................................. 24

3. Dr. King testifies at trial....................................................25

    a. The practice of medicine. ........................................26

    b. The role of opioids in pain management. ................27

    c. Spayd prescribed opioids outside the usual course of professional practice without legitimate medical purpose.....................................29

4. Dr. Broad testifies for Spayd.............................................35

5. Spayd testifies in her defense. ..........................................36

6. The district court instructs the jury on mens rea. ...........39

7. The parties close...............................................................40

8. The jury finds Spayd guilty, and she is sentenced. .........42

SUMMARY OF ARGUMENT .....................................................42

ARGUMENT ...................................................................................45

I.    The district court did not err in admitting Dr. King's challenged testimony..........................................................45

    A.    Standard of Review. ...............................................45

    B.    Discussion...............................................................46

        1. The district court correctly allowed Dr. King to opine that Spayd prescribed outside the usual course of professional practice and without legitimate medical purpose...............................46

2. The district court correctly permitted Dr. King to provide testimony that helped the jury consider Spayd's state of mind. .......................................50

3. The district court did not err, much less plainly err, in letting Dr. King convey the magnitude of Spayd's conduct. ...............................................55

4. Any error was harmless. .....................................57

II. The district court correctly instructed the jury on the mens rea required to find a practitioner guilty of unlawfully distributing drugs. .........................................58

A. Standard of Review. ................................................58

B. Discussion. ..............................................................59

1. The district court properly instructed the jury. ...............59

2. Any error was harmless. .....................................63

III. The government's closing arguments tracked the law and the instructions. .........................................................64

A. Standard of Review. ................................................64

B. Discussion. ..............................................................64

IV. The district court did not err, much less cumulatively err. ..........65

A. Standard of Review. ................................................65

B. Discussion. ..............................................................66

CONCLUSION ...................................................................66

STATEMENT OF RELATED CASES (Form 17)

iii

CERTIFICATE OF COMPLIANCE (Form 8)

# TABLE OF AUTHORITIES

Cases

*Cheek v. United States*, 498 U.S. 192 (1991) ..........................46, 47, 60-62

*Diaz v. United States*, 144 S. Ct. 1727 (2024) ........................................54

*Puckett v. United States*, 556 U.S. 129 (2009)..................................56, 57

*Ruan v. United States*, 597 U.S. 450 (2022) ................................... passim

*United States v. Anderson*, 741 F.3d 938
     (9th Cir. 2013) ...........................................................................58, 63

*United States v. Arambula-Ruiz*, 987 F.2d 599
     (9th Cir. 1993) ...........................................................................45, 57

*United States v. Boettjer*, 569 F.2d 1078
     (9th Cir.1978) ............................................................................47, 60

*United States v. Davila-Escovedo*, 36 F.3d 840
     (9th Cir. 1994) ...........................................................................49, 50

*United States v. Diaz*, 876 F.3d 1194
     (9th Cir. 2017) ...........................................................................52, 54

*United States v. Dunn*, 846 F.2d 761
     (D.C. Cir. 1988)................................................................................51

*United States v. Feingold*, 454 F.3d 1001
     (9th Cir. 2006) ...........................................................47, 49, 60, 63, 65

*United States v. Gonzalez-Becerra*, 784 F.3d 514
     (9th Cir. 2015) ..................................................................................56

*United States v. Haischer*, 780 F.3d 1277
     (9th Cir. 2015) ..................................................................................55

v

*United States v. Henderson*, 241 F.3d 638

  (9th Cir. 2000) ........................................................ 65

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) ...................... 45

*United States v. Liew*, 856 F.3d 585 (9th Cir. 2017) ............................ 58

*United States v. Macias*, 789 F.3d 1011 (9th Cir. 2015) ........................ 65

*United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) ................. 51, 53

*United States v. Navarro*, 608 F.3d 529 (9th Cir. 2010) ................... 64, 65

*United States v. Perez*, 962 F.3d 420 (9th Cir. 2020) ........................... 45

*United States v. Rizk*, 660 F.3d 1125 (9th Cir. 2011) ........................... 55

*United States v. Thongsy*, 577 F.3d 1036 (9th Cir. 2009) ............... 59, 64

*United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011) .......................... 65

*United States v. Young*, 470 U.S. 1. (1985) ....................................... 57

*United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005) ...................... 54

Statutes

18 U.S.C. § 3231 ....................................................................... 2

21 U.S.C. § 841(a)(1) ............................................................... 46

21 U.S.C. § 841(a)(1) and (b)(1)(C) .......................................... 24

21 U.S.C. § 841(a)(1), (b)(1)(C), and (b)(2) .............................. 24

21 U.S.C. § 856(a)(1) ............................................................... 24

28 U.S.C. § 1291 ....................................................................... 2

Rules

Fed. R. Evid. 401 ...................................................................... 55

Fed. R. Evid. 403 ...................................................................... 55

Fed. R. Evid. 702 ...................................................................... 56

Fed. R. Evid. 704(a) ................................................................. 50

Fed. R. Evid. 704(b) ............................................................ 51-54

Regulations

21 C.F.R. § 1306.04(a) ....................................................... 46, 59

## INTRODUCTION

A jury found Appellant-Defendant Jessica Spayd guilty of distributing drugs resulting in five deaths, distributing drugs, and maintaining a drug-involved premises. Spayd unlawfully prescribed opioids as an advanced nurse practitioner, knowingly and intentionally acting far outside the usual course of professional practice and without a legitimate medical purpose. For instance, she rarely physically examined patients, prescribed opioids in lethal doses and hazardous combinations, discounted myriad warnings from doctors, pharmacists, and insurance companies, fretted about the DEA and going to jail, and falsified medical records to mask her conduct.

On appeal, Spayd claims that she sincerely believed that she acted within accepted norms and should not have been convicted. Based on that faulty premise, she challenges a government witness's expert testimony, including his opinion that she grossly deviated from well-established practice standards, the district court's instructions on the mens rea for her offenses, and the government's closing argument. But the challenged testimony, jury instructions, and argument aligned with Supreme Court authority and this Court's precedent.

1

## STATEMENT OF JURISDICTION & BAIL STATUS

The district court's jurisdiction rested on 18 U.S.C. § 3231. This Court's jurisdiction rests on 28 U.S.C. § 1291. The district court entered judgment on June 22, 2023. (1-ER-2-9.)[1] Spayd filed a timely notice of appeal four days later. (16-ER-3129-30.)

According to the Bureau of Prisons, Spayd is in custody, serving her sentence, at a federal correctional institution in Aliceville, Alabama. Her projected release date is November 14, 2047.

## STATEMENT OF THE ISSUES PRESENTED

I.   Whether the district court erred in allowing an expert witness to opine that Spayd prescribed opioids outside the usual course of professional practice and without legitimate medical purpose, provide testimony that helped the jury consider Spayd's mental state, and convey the magnitude of her conduct.

---

[1] "ER" refers to Spayd's excerpts of record; "Exh." to an exhibit admitted or used at trial; "AOB" to her opening brief; and "Dkt." to a document in the district court's electronic case file.

II.     Whether the district court properly instructed the jury on the

        mens rea required to find a medical practitioner guilty of

        unlawfully distributing drugs.

III.    Whether the district court allowed the government to misstate the

        mens rea during its closing arguments.

IV.     Whether any cumulative error prejudiced Spayd.

## STATEMENT OF THE CASE

### A.    Facts

#### 1.    Spayd starts her pain management clinic.

Spayd became an advanced nurse practitioner at the end of 1999.

(13-ER-2493.) After moving to Alaska, she obtained board certification

in family medicine and earned her license. (13-ER-2498-2501.) In 2001,

she started working and training under an anesthesiologist at a pain

management clinic and learned about opioid prescribing. (13-ER-2501-

02, 2504-05.) She attended medical conferences as part of her training.

(13-ER-2506.)

In June 2002, Spayd opened her own pain management clinic in

Eagle River, Alaska. (13-ER-2508.) She continued attending conferences

and added continuing education programs. (13-ER-2506-07, 2510-11.)

She also read a lot of literature and learned to look at data and to make decisions based on science. (13-ER-2507, 2510, 2521; 14-ER-2576-77, 2579-80.) Among other things, she learned about the guidelines for limiting opioid dosages, the risks of mixing opioids with alcohol and other drugs, and the importance of physically examining patients. (14-ER-2613, 2712-14.)

### 2. Spayd abandons practice standards.

Spayd began prescribing high doses of opioids and stopped declining patients, and people traveled long distances to visit her clinic and used different pharmacies to get their prescriptions filled. (9-ER-1626-28; 11-ER-1971-72.) For a period between 2015 and 2019, she prescribed higher doses of opioids than any other provider in Alaska. (Exh. 246.01.) She did not properly care for her patients. (9-ER-1599, 1602-03, 1609.)

As one example, Spayd met with a patient for only a few minutes during clinic visits yet continued to prescribe her opioids. (2-ER-148-49, 151.) She did not perform physical evaluations or even listen to the patient's heartbeat. (2-ER-150.) And she spent the majority of their limited time chatting about non-medical topics. (2-ER-152.) During

4

2015, Spayd prescribed the patient nine morphine pills per day, ten fentanyl patches per month, and a separate opioid for breakthrough pain. (2-ER-151.) She also prescribed her diazepam (Valium) for sleep and an amphetamine so that she could function during the day. (2-ER-151-52.) Spayd did not discuss alternatives to opioids. (2-ER-152.) The patient had difficulty filling the prescriptions because pharmacies rarely carried opioids in such volumes. (2-ER-152-53.)

In another example, a patient began visiting Spayd in January 2014 after other treatments for a sore back and shoulder did not work. (3-ER-354-58.) Spayd never physically examined him during his ten-to-fifteen-minute appointments but prescribed him opioids that he did not need or want despite thinking that he "might be addicted." (3-ER-357, 359-60, 367-68.) In 2018, Walmart stopped filling his prescriptions. (3-ER-372.)

Another patient described her visits to the clinic as "therapy sessions" for Spayd in which Spayd talked about what was "going on in her life." (4-ER-457.) Spayd never physically examined her, did not do any diagnostic testing, and increased the doses of opioids that her prior doctor had prescribed. (4-ER-456-58.) Spayd did so even though the

5

patient told her that she was taking a benzodiazepine (Valium) for bipolar disorder. (4-ER-457, 463.) Spayd also prescribed her a muscle relaxer but never told her that taking all three drugs heightened her risk of overdose. (4-ER-464-65.) Sometimes, the patient paid $25 in cash and left with her scripts without visiting Spayd or another provider. (4-ER-458.) The pills "ruled [her] life," and she sometimes ran out early because she used them faster than she should have. (4-ER-465, 468, 469, 472.) Her insurance company sent Spayd two dozen letters between 2013 and 2019 warning about the high doses, and pharmacies stopped filling the patient's prescriptions. (4-ER-470-72; Exh. 155.)

When a different patient questioned her heavy doses, Spayd replied only that many of her other patients took even higher doses. (5-ER-706-07.) Spayd told her not to go to the Walmart pharmacy because they had stopped filling Spayd's prescriptions. (5-ER-708.)

When a patient informed Spayd that a doctor had told him to stop using an opioid before a kidney transplant, Spayd responded that she would discuss it later but that they would "just leave it like that for now" because the opioid was working. (5-ER-806-07.) When he could no longer fill the prescriptions in Anchorage and traveled to Wasilla,

6

Alaska, Spayd got upset with him, worrying that she would "get in trouble" if he traveled to fill them. (5-ER-809-10.)

Spayd prescribed opioids to a visibly pregnant patient. (3-ER-238, 240.) She prescribed 1,582 powerful "fentanyl lollipops," which were designed to relieve breakthrough cancer pain, for migraine headaches when she knew that they were not approved for such use and failed to inform the patient of that. (6-ER-1061-62; 13-ER-2469-77; Exhs. 159, 487.) And like so many of her patients, Spayd also had addiction issues: in March and April 2015, she stayed in California for 40 days for treatment yet still wrote several hundred opioid scripts for her clinic. (9-ER-1633-35; 11-ER-1974.)

### 3. Spayd falsifies medical records.

Between June 2017 and October 2018, Spayd prescribed her boyfriend Richard Dupuis high doses of opioids in the name of James Eleazer and billed Eleazer's insurance company. (3-ER-246-58, 270-72, 276, 306; 5-ER-743-44; Exh. 254.) Even after pharmacists spotted it and told her they had talked to Eleazer, she claimed that Eleazer visited her clinic monthly. (3-ER-258.) Soon relenting, Spayd said only that she knew Dupuis, was "sorry," and she "would never do it again"; she also

7

begged the pharmacist not to call the DEA. (3-ER-259-60.) The pharmacy stopped filling Spayd's prescriptions, and in November 2018, it alerted the DEA. (3-ER-261; 8-ER-1410.) Around this time, Spayd began reducing her patients' opioid dosages. (11-ER-1975-76.)

Eleazer, who was a long-time work acquaintance of Dupuis's, had only visited Spayd's clinic twice (the last time was in 2012) for high cholesterol and did not see her either time. (3-ER-263-64, 267.) Yet Spayd recorded that he visited her clinic multiple times during 2017 and 2018. (3-ER-282, 287-96; Exh. 125.) For example, she recorded in June 2018 that she physically examined Eleazer during a visit, that he had "aching lumbar pain," and that he tolerated Percocet well; but Eleazer was in the Philippines at the time. (3-ER-282-87.) In like fashion, Spayd used another acquaintance of Dupuis's, Nicholas Walsh, to distribute opioids to Dupuis. (3-ER-307-32, 350-51.) She also recorded that Walsh had visited her clinic when he had not. (3-ER-322-26; Exhs. 306, 334.)

In another example, Spayd recorded in January 2017 that a patient's son would "keep his mother safe from her opioids" and that she would stop using a fentanyl patch to halve her dosage. (2-ER-151, 155-

8

56.) In fact, he did not know how to keep his mother safe, he did not tell Spayd that he would do so, and his mom did not stop using fentanyl. (2-ER-156.) A month later, Spayd recorded that he reported that his mother's medications were "working well" when, in fact, he told Spayd that his mother was abusing them, Spayd needed to decrease them, and he had a "massive amount of opioids that needed to be destroyed." (2-ER-157.) A few months after that, Spayd recorded that he would store his mother's medications in a safe; he never said that either, and his mother kept control of them. (2-ER-157-58.)

Spayd also falsified records of other patients' visits, including purporting to perform physical exams. (3-ER-364; 4-ER-459, 461; 5-ER-703-04; 6-ER-1056-58.) In one instance, Spayd recorded that a patient's hearing was "grossly intact" despite her wearing two hearing aids, and she recorded that the patient's thyroid was "normal" when it had been surgically removed to treat cancer. (4-ER-459-61.) A doctor testified that documenting "accurate information is very important" and that "[i]n some ways having wrong information could be worse than no information at all." (6-ER-1079-80.)

//

9

### 4. Spayd's practices alarm her employees.

Spayd's employees became concerned when she told them to stop highlighting "dirty" urinalysis tests. (5-ER-725-26, 777.) The clinic randomly tested patients' urine to check whether they were diverting opioids or using alcohol or other drugs. (5-ER-721-22, 783-84.) If patients were, Spayd required them to visit more often or dismissed them from the clinic. (5-ER-721-23.) But starting in 2014 and 2015, she became lenient and allowed them to continue, even if they were dangerously combining opioids with other drugs. (5-ER-723, 726, 748.) Spayd even prescribed opioids to a patient who tested positive for cocaine. (5-ER-745-46, 775-77, 787-88.) When her employees protested, she ignored them. (5-ER-726.)

In 2015, before Spayd left for California for treatment, she pre-printed and pre-signed scripts. (5-ER-732.) Sometimes, she required her employees to sign scripts even if she was in the clinic, which they knew was illegal. (5-ER-730-31.) When they resisted, she yelled at them. (5-ER-731.) Other times, if Spayd did not come to the clinic, she signed scripts at home and allowed patients to have them for $25 cash, as the

clinic could not bill patients' insurance companies in those cases. (5-ER-735, 781-82.)

Spayd's employees worried that patients were taking too many opioids. (5-ER-768.) She ignored those concerns, too. (5-ER-769.) Instead, she fretted about the DEA and asked her staff whether they thought that new patients were DEA agents. (5-ER-773, 788.)

Spayd's staff noted that she irritated patients by spending too much time talking about herself. (5-ER-733.) They observed that she routinely copied her notes from a patient's prior visit rather than recording fresh observations. (5-ER-749.) They saw her empty liquor bottles. (5-ER-771-72.) And in 2018, they heard her on the phone yelling at pharmacists. (5-ER-771.)

### 5. Spayd's prescriptions alarm pharmacists.

Pharmacists have a duty to ensure that prescriptions are within the usual course of a practitioner's practice and for a legitimate medical purpose, and to refuse ones that are not. (2-ER-82-83, 174, 177.) In January 2019, a U.S. Air Force pharmacy director blanketly refused to fill Spayd's prescriptions because five of her patients were receiving opioid doses three to six times higher than the recommended level. (2-

11

ER-79, 82, 104, 108-09, 122-23; Exh. 339.) None of the five were cancer patients, in hospice care, or otherwise warranted such high doses. (2-ER-104-05, 141.) One even was in his 70s and also taking a muscle relaxer, putting him at overdose risk; another was a practicing surgeon likely operating while impaired. (2-ER-111-13, 123.) The pharmacist defended his decision to Spayd, citing high doses and patients having multiple prescriptions at "questionable times." (2-ER-116-17, 122-24; Exh. 339.) He also reminded her that his pharmacists had called her many times and that she had responded in a "contentious manner." (2-ER-89-90, 123-24; Exh. 339.) It was the first time he barred prescriptions from a practitioner in his 22-year career. (2-ER-144.)

In two months, a different pharmacy refused to fill one of Spayd's prescriptions. (2-ER-195.) Pharmacists there were alarmed by her prescribing an "extremely high dose" of methadone combined with another opioid. (2-ER-190; Exh. 150.) The pharmacy manager contacted Spayd and asked her to start reducing the dosages, especially the methadone. (2-ER-173, 192-93.) Spayd said that she would. (2-ER-194.) But when she did not, and the manager inquired, Spayd replied that

she had hoped that the patient would go to another pharmacy. (2-ER-195-96.)

Other pharmacists, too, were alarmed by Spayd's prescriptions because of the heavy opioid doses and dangerous combinations of medications. (3-ER-330, 333-37, 413-16; 4-ER-642.) Between 2016 and 2019, one pharmacy called Spayd 200 times or more to discuss its concerns. (3-ER-337-38.) On a rare occasion when they were able to speak to her, she replied "Ok" when told that they would not fill one of her prescriptions. (3-ER-338-41.) She did not try to justify the prescription or challenge the decision. (3-ER-341.)

A pharmacist in Soldotna, Alaska, noted that four of Spayd's patients drove several hours to visit her and returned with high-dose scripts. (4-ER-641-43.) He grew uncomfortable filling Spayd's prescriptions, had a hard time reaching her, and decided not to fill some of them. (4-ER-643-46.) When he did fill one, he recommended that the patient reduce his opioid use and seek better care from a new provider. (4-ER-648.) He also gave two of the patients Narcan in case they overdosed. (4-ER-648-49.) When two stopped seeing Spayd, they quit using opioids and greatly improved their health. (4-ER-650-52.)

13

In December 2018, Spayd texted one of her patients that "[t]hese pharmacists" were "f****** her s*** up!" (Exh. 292.06 cleaned up.)

### 6.  Spayd's prescriptions alarm doctors.

In July 2017, a doctor wrote Spayd a letter warning that a patient's opioid prescriptions risked overdose and asking her to consider changing course. (3-ER-375-77.) Spayd never mentioned the letter to her patient and increased the number of his pills. (3-ER-377, 391-92.) Six months later, the doctor wrote Spayd a second letter, which Spayd also did not discuss with the patient. (3-ER-392-93.) A third letter counseled Spayd that practitioners should be able to properly prescribe and manage their patients' opioid use. (3-ER-393-95.) Spayd did not discuss this letter either, including its warning that the opioid should be reserved only for "severe cases" and used for less than two weeks. (3-ER-395.) Spayd prescribed it for more than four years. (3-ER-395.) Eventually, no pharmacy would fill the prescriptions. (3-ER-401.) Within five months of starting with a different clinic, the patient stopped taking opioids completely. (3-ER-400-03.)

A different doctor who specialized in managing pain and treating addiction saw former patients of Spayd's. (4-ER-479-80.) In her view,

14

Spayd's doses were too high, and patients misused the drugs. (4-ER-481.) She tapered one off opioids over a twelve-to-eighteen-month period. (4-ER-495-96.)

A doctor who cared for one of Spayd's patients hospitalized for a heart infection worried after he learned that Spayd was prescribing high doses of opioids for ailments not usually treated that way. (6-ER-1079-83.) After Spayd did not reduce the dosages, the doctor referred the patient to a physician who lowered them, improving the patient's health. (6-ER-1084-86.)

In 2016, an emergency room doctor treated one of Spayd's patients, L.D., for an overdose. (5-ER-671-72, 675, 676.) He observed that Spayd had prescribed L.D. the "highest dose of chronic narcotics that [he] had seen in our community," made worse by L.D.'s being 68 years old. (5-ER-673-74.) The doctor warned L.D. and his family, concluded that L.D. was "opioid dependent," and recommended other forms of treatment. (5-ER-671, 679, 684-87.) Spayd reduced the dosage temporarily but resumed the high levels. (5-ER-679-82.) Despite knowing that he abused the drugs, between February 13 and 20, 2019, she prescribed him 60 oxycodone pills for 15 days, and then 180

15

oxycodone pills for 30 days and 15 fentanyl patches, a "really high" and unsafe dose. (5-ER-682, 684, 757-58; Exh. 266.)

### 7. Spayd's patients die of overdoses.

L.D. was 71 years old in early March 2019 when he collapsed and arrived at an emergency room. (4-ER-616-18; 5-ER-688-89.) A nurse immediately removed two fentanyl patches from his chest, but he was pronounced dead within minutes. (4-ER-618-19; 5-ER-688-89.) He had oxycodone and a lethal amount of fentanyl in his system. (4-ER-621, 622-23; 6-ER-1022-23.) A medical examiner determined that he died of high blood pressure resulting from those prescribed drugs. (4-ER-624, 630, 638.)

Several years earlier, J.L. was 42 when she died in October 2014 on the floor of her bathroom. (5-ER-791-92; 6-ER-913-14, 935.) Without properly diagnosing her, Spayd prescribed methadone. (5-ER-767; 8-ER-1271-72; Exh. 267.) Yet Spayd knew that J.L. abused alcohol, was addicted to opioids, and had overdosed many times. (5-ER-792; 8-ER-1272-73, 1282-83, 1285.) In 2012, an ER doctor told Spayd that she should wean J.L. off opioids, as the hospital had begun. (8-ER-1286-87, 1289, 1290-91.) But Spayd ignored the warning and continued to

prescribe massive doses of methadone in an "extreme departure from the standard of care." (8-ER-1292-93.) A note near J.L.'s dead body hinted that she had wanted to stop using drugs and alcohol and improve her life. (6-ER-917-18, 922; Exh. 215.) A toxicology report showed that she had benzodiazepine, a high level of methadone, and oxycodone in her system. (6-ER-931-34, 1008-12.) A medical examiner determined that she died from consuming those drugs, particularly the methadone. (6-ER-912, 918-19, 923, 934, 935, 936-37.)

K.B. was 50 in September 2015 when she was found face-down in vomit next to a syringe. (4-ER-596, 599, 601-02, 612; 7-ER-1099-1101.) For a time, K.B. took high doses of opioids that Spayd prescribed for a neck injury. (6-ER-880-81, 888.) After the drugs reduced her functionality and she overdosed, K.B.'s mother called Spayd. (6-ER-882-889, 892.) Spayd, however, refused to discuss the prescriptions and hung up. (6-ER-892-93.) In late February 2015, her mother convinced K.B. to move to Texas to live with her. (6-ER-893-94.) K.B. stopped using opioids, her life improved, and she had successful surgery on her neck. (6-ER-895-97.)

//

17

But after K.B. returned to Alaska to gather her belongings, she visited Spayd's clinic for the first time in eight months. (6-ER-899-902.) The day before she was found dead, Spayd prescribed her a high dose of hydromorphone and a muscle relaxer, which was "exceptionally dangerous" because K.B. had lost her opioid tolerance. (4-ER-603, 605; 5-ER-754; 6-ER-903, 1002; 8-ER-1316; Exh. 107.) A pill bottle of prescribed hydromorphone in powdery form was on a countertop next to her body. (4-ER-599, 605; 7-ER-1101-02, 1108-13.) A toxicology report reflected that she had an elevated level of hydromorphone along with a muscle relaxer. (4-ER-607-08, 610, 995-96.) A medical examiner determined that she died after her heart stopped beating. (4-ER-611.)

B.S. was 74 when she died a few months later in December 2015 amid bottles of opioids that Spayd had just prescribed. (4-ER-534-36, 543, 545-50.) She had "every aberrant predictor" of overdose death and was a "disaster in coming." (9-ER-1480.) Yet Spayd prescribed her "uncharted" doses of opioids. (9-ER-1480-83.) A forensic toxicologist found that her blood contained an extremely high level of methadone sufficient, by itself, to cause her death. (4-ER-554-60, 562, 588; 6-ER-

1026-27.) A medical examiner determined that she died of methadone intoxication resulting from Spayd's prescriptions. (4-ER-562, 587.)

Shortly after B.S.'s death, E.K. was 59 when she died in her bed in early February 2016. (6-ER-938, 951; 12-ER-2159.) She called Spayd's clinic more than once drunk and complained that pharmacies resisted filling her prescriptions. (5-ER-759-60.) E.K.'s insurance company sent Spayd weekly letters warning about high doses. (5-ER-761-63.) In late January 2016, Spayd prescribed her Valium, methadone, and oxycodone, knowing that it heightened the risk of overdose death. (5-ER-764-65; 9-ER-1514-15.) When she died, she had benzodiazepine, oxycodone and a high level of methadone and alcohol in her body. (6-ER-946-50, 1017-20.) A medical examiner concluded that she died from consuming those drugs. (6-ER-951-52.)

Other clinic patients died, too.[2] (11-ER-1927.) After a woman died in August 2019, Spayd's staff remarked that she had breathing issues, guessed that those problems combined with opioids caused her death,

---

[2] The government did not charge Spayd for deaths beyond the five patients identified by their initials.

19

and overheard Spayd on the phone telling the woman's husband to "do me [a] favor [and] don't let anyone see those bottles." (11-ER-1919-23.)

### 8. Spayd prescribes opioids to an undercover agent.

The DEA began investigating Spayd in 2018 after it received information from sources and complaints from doctors and pharmacists, including the one who confronted Spayd about distributing opioids to Dupuis. (8-ER-1362-63.) Toward the end of the investigation, an agent posing as a new patient visited the clinic four times. (8-ER-1362.)

In his first visit in May 2019, the agent entered and immediately saw a sign telling patients that a local grocery chain was not filling Spayd's prescriptions. (8-ER-1370, 1395.) The agent had made the appointment under the guise that he was an addict seeking Suboxone, a medication used to treat opioid addiction. (8-ER-1372.) But he asked Spayd for oxycodone so that he could avoid withdrawal symptoms and work. (8-ER-1373; Exh. 1.) He explained that he became addicted after using it recreationally and was buying it on the street. (8-ER-1386-87, 1399, 1421; Exh. 1.) She hesitated, worried that area pharmacies were not filling her prescriptions, prescribing oxycodone to satisfy his

addiction was a felony, and he might be a DEA agent. (8-ER-1374; Exh. 1.)

Minutes later, though, Spayd agreed to prescribe it. (8-ER-1377; Exh. 1.) But she did not physically examine the agent, and he did not say that he was in pain. (8-ER-1384-86, 1421-22.) After Spayd repeated that pharmacies were not filling her prescriptions, he assured her that his friend in Fairbanks would fill it. (8-ER-1380; Exh. 1.) She then advised him how to beat a drug test. (8-ER-1378-79; Exh. 1.) She charged him $300 cash for the visit, and he left with a prescription for a six-day supply. (8-ER-1382, 1387.)

Spayd falsified her records of the visit. (8-ER-1396-1401, 1421.) For example, she recorded that she physically examined the agent when she had not. (8-ER-1399-1401, 1421.) And although he said that he was addicted and buying oxycodone on the street, she did not record any aberrant drug behavior. (8-ER-1399, 1421.)

The agent returned about a week later and told Spayd that he had finished the oxycodone early. (8-ER-1401-02; Exh. 2.) Sympathetic, she said that she had given him a low dose because of her troubles with pharmacies. (8-ER-1402; Exh. 2.) After he asked her for oxycodone to

21

cover the two weeks that he would be away working, she prescribed a three-week supply and increased the dose. (8-ER-1404-05; Exh. 2.)

The agent arrived in mid-June for his third visit expecting to see Spayd. (8-ER-1405, 1406.) Her staff told him that she was not there but that he could have his script for $25. (8-ER-1405; Exh. 3.) After submitting a urine sample, he left with a new prescription at the same dosage. (8-ER-1406.)

At his fourth visit in early July, the agent asked Spayd to continue him on the oxycodone. (8-ER-1408; Exh. 4.) Spayd refused and said that she could go to jail, she heard that a DEA agent had asked questions about her recently, and that she should not have prescribed it to him. (8-ER-1408; Exh. 4.) She also remarked that the DEA could look at her medical charts at any time. (Exh. 4.) Instead of oxycodone, he left with a prescription for Suboxone. (8-ER-1408, 1410.)

### 9. Spayd is arrested.

Spayd was arrested in October 2019. (*See* Dkt. 1.) In an interview with federal agents before they searched her clinic, she said that physical exams and understanding patients' histories were important to treating patients. (9-ER-1635-36, 1639.) She acknowledged the CDC

guidelines on the upper range for opioid dosages. (9-ER-1644-45.) She also said that prescribing to patients to treat their addictions was against the law. (9-ER-1640.) When asked about overdose deaths, she recalled only two patients and claimed not to know whether either died of overdose. (9-ER-1643.) She did not mention L.D., K.B., J.L., B.S., or E.K. (9-ER-1643-44.) She lied about text messaging with patients, explaining that she could not because she prescribed narcotics; in fact, she routinely texted with them to discuss prescriptions and pharmacies. (10-ER-1678, 1695-1702, 1707.) She also claimed that she had prescribed Dupuis non-opioid medication and that he was just a patient. (10-ER-1679.) When agents searched her residence, Dupuis was living there. (5-ER-829, 831, 837-38.)

After one patient learned of Spayd's arrest, she "didn't know where [she] would get her pain medication from" and was "terrified" about experiencing withdrawal. (5-ER-709-10.) But with the help of another doctor, she stopped taking opioids in two months after receiving droves of them from Spayd for a decade. (5-ER-710-11.) Her life greatly improved. (5-ER-711-12.)

//

23

**B.    Procedural History**

**1.    Spayd is charged in a superseding indictment.**

In January 2021, Spayd was charged in a superseding indictment with three counts of distributing and dispensing Schedule II controlled substances resulting in death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); and two counts of distributing and dispensing Schedule II and Schedule IV controlled substances resulting in death, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and (b)(2). (16-ER-3117-23.) She was also charged with four counts of distributing and dispensing Schedule II controlled substances, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); and one count of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1). (16-ER-3117-23.)

**2.    The district court denies Spayd's motion to exclude testimony from Dr. King.**

Spayd moved to preclude Dr. King from testifying. (16-ER-3079-86, incorporating 16-ER-3100-08.) She claimed that he would draw on the wrong legal standard if he explained objective standards of medical care and prejudice her if he opined that she departed from them. (16-ER-3081-84, 3086.) Instead, Spayd argued that whether she acted with

24

criminal intent depended purely on her subjective mindset. (16-ER-3080, 3107.)

The district court disagreed. (16-ER-3065-68.) It ruled that *Ruan v. United States*, 597 U.S. 450, 467 (2022), permitted the government to prove Spayd's knowledge and intent by measuring the reasonableness of her subjective beliefs against objective standards. (16-ER-3066.) Thus, the government must be able to present evidence of those standards through expert testimony on the usual course of professional practice and legitimate medical purpose. (16-ER-3066, 3067.) But this did not mean that Spayd could be criminally liable for medical malpractice; she could be convicted only if she knowingly or intentionally prescribed opioids outside the usual course of professional practice and without a legitimate medical purpose. (16-ER-3066.)

### 3. Dr. King testifies at trial.

After presenting testimony and other evidence as outlined above, the government called Dr. King as a witness. (7-ER-1113.) Dr. King was a medical doctor board certified in pain management and addiction treatment. (7-ER-1116-17.) He practiced full-time for 46 years and served for a period as the chief medical officer for a group that managed

25

pain. (7-ER-1116, 1118, 1123.) After semi-retiring, he lectured on the practice of medicine and proper use of opioids and consulted on legal matters. (7-ER-1121, 1123, 1238; 9-ER-1550-51.)

### a.     **The practice of medicine**.

Dr. King explained that the established approach to medicine rests on protecting the patient and acting as a prudent practitioner would. (7-ER-1125, 1126.) In other words, "do good for the patient" and "do no harm to the patient." (7-ER-1127.) To those ends, practitioners start patient relationships by learning their patients' medical histories, including their present complaints and prior treatments, to diagnose their conditions. (7-ER-1127-29.) They also evaluate their patients' mental health, disruptions in their lives, and other physical health issues. (7-ER-1129-30.) Physically examining patients, Dr. King told the jury, is "mandatory." (7-ER-1132-33.) After objectively diagnosing an illness or other problem based on proper evaluation, practitioners' next steps are to plan suitable treatments and verify whether they are effective. (7-ER-1146, 1151; 8-ER-1271.)

Every time patients visit, practitioners must repeat this cycle of examining, diagnosing, treating, and checking the results, and

documenting it accurately in a written record. (7-ER-1157, 1218-21.) All practitioners are trained to do this. (7-ER-1158, 1159.) That is the standard of care; that is the practice of medicine. (7-ER-1159, 1163.) Additional standards for specific practices are set forth in peer-reviewed literature, papers from medical organizations, and in government regulations, guidelines, and recommendations. (7-ER-1162-63.) Practitioners remain aware of these standards through required continuing education and other methods. (7-ER-1164-65.)

### b. The role of opioids in pain management.

To manage pain, practitioners choose among options, including surgical procedures, physical therapies, injections, psychological treatment, and mindfulness training. (7-ER-1147-48.) Dr. King said that no meaningful evidence supports prescribing opioids long-term to treat chronic pain. (7-ER-1150, 1183.) Instead, opioids are best suited for treating acute pain, or pain that will lessen as the patient heals. (7-ER-1182.) Still, to prescribe opioids in the short term, practitioners must ensure that their patients' function improves (for example, they return to work) while their pain levels improve by about thirty percent, the "gold standard[s]" in managing pain. (7-ER-1150-51, 1152, 1155,

27

1239; 8-ER-1301.) If not, or there are signs that patients are abusing the drugs or the drugs are causing suffering, practitioners should alter course. (7-ER-1151, 1153, 1155-56.)

Practitioners, in fact, must assume that their patients will deviate from taking opioids as directed and may be addicted, weigh that risk against benefits, and take precautions. (7-ER-1173-75, 1233-34.) The risks, which increase with higher doses and patients' age, include impaired cognition, heart arrythmia, breathing difficulties, comorbid illnesses, use with other drugs and alcohol, worsening pain, mental health problems, birth defects, addiction (including in newborns), overdose, and death. (7-ER-1183-86, 1198-99, 1200-02, 1205-06, 1215-16, 1222-24, 1226-28.) Since the 1990s, medical publications and so forth have communicated these and other risks and ensuing practice guidelines to practitioners. (7-ER-1190-1216, 1225-26, 1233.) Under the usual course of medical practice, prudent practitioners starting opioid treatment should prescribe low doses of opioids on a trial basis for short periods of four to six weeks, or even less, so that they can look for and prevent problems. (7-ER-1156, 1182-83, 1239; 9-ER-1606.)

//

28

Dr. King also explained that DEA regulations, and thus the usual course of medical practice, require practitioners to sign and date their prescriptions for controlled substances on the date they issue them; office staff may not sign for a practitioner. (8-ER-1265-66.) Likewise, practitioners may not pre-sign prescriptions for their staff to give to patients. (9-ER-1451-52.) Practitioners, too, must issue a prescription to a patient for that patient's use, not for anyone else's. (8-ER-1266-67.)

### c. Spayd prescribed opioids outside the usual course of professional practice without legitimate medical purpose.

Among other things, Dr. King reviewed the full medical charts of six of Spayd's patients: the five overdose decedents and the undercover DEA agent, totaling around 6,000 pages of records. (7-ER-1176, 1241-42.) He also reviewed Spayd's prescribing data for controlled substances between 2014 and 2019. (7-ER-1242.)

He opined that Spayd prescribed opioids outside the usual course of medical practice and without a legitimate medical purpose, including by:

- Prescribing high doses of opioids after misdiagnosing or waiting to properly diagnose patients and neglecting to

29

physically examine them or perform proper testing. (8-ER-1271-72, 1277-81, 1311-12, 1316-17, 1323, 1325-26, 1339; 9-ER-1455-56, 1459, 1493, 1497-98, 1527-28, 1532.)

- Prescribing high doses of opioids as the sole form of treatment. (8-ER-1307, 1321; 9-ER-1476, 1491, 1520.)

- Prescribing high doses of opioids to support addiction and dependency, an illegitimate medical purpose. (8-ER-1297, 1308, 1320, 1339; 9-ER-1475.)

- Prescribing and even increasing high doses of opioids to patients who had strong signs of alcohol or drug abuse, including prior overdoses, withdrawal symptoms, and repeated warnings from insurance companies, or to patients that she knew had overdosed or abused drugs previously, including the drugs she prescribed, which all risked future overdose. (7-ER-1196-97, 1216-18; 8-ER-1272-73, 1281-82, 1295-96, 1299-1300, 1326, 1343-44, 1346-47, 1349; 9-ER-1452-55, 1459, 1460-63, 1465-67, 1474, 1483, 1502, 1503-05, 1507-09, 1512-14, 1604.)

- Prescribing high doses of opioids to patients who had mental health issues, such as schizophrenia, bipolar disorder, depression, anxiety, borderline personality disorder, or prior suicide attempts or gestures. (8-ER-1273, 1312-14, 1316-17, 1326.)

- Prescribing opioids along with other drugs, or prescribing opioids to patients who took or abused other drugs (for example, Xanax or Valium), the combination of which heightens the risk of overdose death. (8-ER-1289-90, 1295-96, 1297, 1317-21, 1327; 9-ER-1485-86, 1499-1501.)

- Prescribing high doses of opioids to patients with elevated overdose risk because of age or physical conditions or ailments, like obesity, liver problems, lung issues, hypertension, or heart disease, increasing the risk of overdose death. (8-ER-1313, 1316-17; 9-ER-1471, 1487-88.)

- Prescribing opioids to patients who were experiencing adverse side effects from the drugs and thus needed to be weaned from them. (9-ER-1457, 1507-08.)

//

- Prescribing high doses of opioids to patients who were experiencing disruptions in their lives, such as marital problems, divorce, and homelessness. (8-ER-1313-14, 1316-17, 1320.)

- Prescribing high doses of opioids, and even increasing the doses, to patients whom she had dismissed from her practice or put on "probation" for using other drugs. (8-ER-1296-97; 9-ER-1485, 1509.)

- Prescribing high doses of opioids to patients who had been given opioids by other providers but had not improved. (8-ER-1303; 9-ER-1495-97.)

- Continuing to prescribe opioids to patients who had not shown improvements in function or pain relief under her care. (8-ER-1301-02, 1307, 1321, 1327-29, 1346; 9-ER-1476, 1488-89.)

- Prescribing high doses of opioids to patients who had stopped taking the drugs, or claimed to have tapered off, which, if true, would heighten the risk of overdose death

32

after restarting them. (8-ER-1274, 1276-77, 1315-17, 1337; 9-ER-1484-85.)

- Prescribing opioids to patients who claimed that their previously prescribed drugs had been lost or stolen, a sign of drug abuse or addiction. (8-ER-1298-1300.)

- Prescribing high doses of opioids to patients who had been on heavy doses of the drugs before visiting her. (8-ER-1273-74.)

- Providing at least one patient with early refills for opioid prescriptions and extra pills at each visit, which leads to a patient accumulating the drug and using it at the patient's discretion. (8-ER-1331-32.)

- Prescribing high doses of opioids to K.B. without inquiring about her use of alcohol or other drugs. (8-ER-1312.)

- Refusing to talk to and hanging up the phone on K.B.'s mother after she called Spayd to express concern that her daughter abused the prescribed drugs, passed out and was unconscious in classes, and could not hold a job. (8-ER-1337-38.)

- Continuing to prescribe high doses of opioids to J.L. even after she had overdosed on the ones that Spayd had previously prescribed her, was hospitalized, emergency room doctors began to wean J.L. off the drugs, the doctors informed Spayd of the overdose, and Spayd noted that she had reviewed J.L.'s hospital records. (8-ER-1283-93.)

- Inadequately examining her role in her patients' overdose deaths. (8-ER-1335-37; 9-ER-1517-19.)

- Practicing medicine and prescribing opioids while she was impaired. (9-ER-1529-30.)

- Advising a patient how to beat a urine drug screen. (9-ER-1530.)

- And falsifying medical records. (9-ER-1528.)

Dr. King concluded that Spayd's prescriptions of "extremely high" doses of opioids were an "extreme departure from the standard of care." (9-ER-1599, 1609.) "She prescribed medications without a legitimate medical purpose, mostly in support of abuse and addiction." (9-ER-1602.) In short, she operated a "pill mill." (9-ER-1602-03.)

//

34

### 4.    Dr. Broad testifies for Spayd.

Along with presenting her former office manager, an accountant, a pharmaceutical sales representative, former patients, and a Florida medical examiner as witnesses, Spayd called Dr. Broad to the stand. (10-ER-1723.) Dr. Broad was a medical doctor board certified in pain management but had little experience prescribing opioids. (10-ER-1724-26, 1797-99.) He said that practitioners should hesitate to dismiss patients who abused drugs or alcohol because that risked their seeking drugs on the street or suicide. (10-ER-1775-76.) In his telling, the five decedents here were better off with Spayd than without—even though they died of overdoses. (10-ER-1795-96.) Even K.B., who had stopped using opioids but died within hours of resuming them after visiting Spayd. (10-ER-1849-51.)

Still, he conceded that each of those patients was an addict, and that Spayd's records of their clinic visits were "lacking," including notes on physical exams. (10-ER-1771-72, 1781, 1784-85.) He stated that physical examinations were necessary in prescribing opioids and should be performed at least once per month. (10-ER-1742-44, 1855.) And he

agreed that Spayd's oxycodone prescriptions to the undercover agent were outside the usual course of medical practice. (10-ER-1860-61.)

**5.  Spayd testifies in her defense.**

Spayd was the final witness in her trial. (13-ER-2492.) She claimed that her goal was to prescribe opioids to maximize her patients' functionality and maintain it, which she believed was in the normal course of practice and a legitimate medical purpose. (14-ER-2583, 2598, 2688; 15-ER-2879.) She said that she believed that opioids were effective over the long-term, basing her view partly on observing and talking to her patients. (14-ER-2586, 2612, 2618.) At the same time, she said that she did not believe that her patients' pain would typically improve. (14-ER-2573-75.) If she stopped prescribing them opioids, she was afraid that they would buy drugs on the street. (14-ER-2609-11.)

But she knew that physical exams were a standard of care and an important part of evaluating patients. (14-ER-2720.) Yet she admitted that she did not physically examine her patients every time because she did not think that it was necessary. (14-ER-2669-70, 2721-26.) Instead, she believed it was enough to observe them, including watching them walk up a few stairs. (14-ER-2671-72.)

36

She knew that she should not prescribe opioids to pregnant women. (14-ER-2772.) Yet she admitted doing just that with a pregnant woman who had even miscarried previously while under her care. (14-ER-2772-75.)

She knew that people abused opioids and other drugs and knew to check for it. (14-ER-2591, 2624-28, 2668, 2713.) She knew the risks of mixing opioids with alcohol, benzodiazepines, muscle relaxers, and other drugs. (14-ER-2596, 2608, 2682, 2712-13, 2719, 2733, 2785.) She knew, too, that there were links between high opioid doses and overdose deaths. (14-ER-2714.) She also knew that using opioids presented a higher risk to the elderly. (15-ER-2852.)

But she admitted that she prescribed J.L. a heavy dose of opioids knowing that she was misusing benzodiazepines. (15-ER-2836-38.) She knew also that E.K. combined opioids with benzodiazepines and alcohol and acknowledged receiving many warning letters from E.K.'s insurance company. (14-ER-2719-20, 2785.) Likewise, she knew that L.D. was abusing opioids and acknowledged that his insurance company also sent her many warning letters. (15-ER-2848-52.) She said that she should have been concerned about prescribing K.B. opioids and a

37

muscle relaxer but suggested that K.B. wanted to continue taking the relaxer. (14-ER-2665-66.) She said that she prescribed opioids to B.S. even though there were "red flags." (15-ER-2843-45.) Similarly, Spayd admitted prescribing a patient an opioid, a benzodiazepine, and a muscle relaxer and receiving a letter from the patient's insurance company warning her of this "Holy Trinity." (14-ER-2732-35.) In fact, Spayd conceded that between 2014 and 2019, she wrote 1,445 of these unsafe prescriptions totaling 135,511 pills. (14-ER-2736.) Yet despite the warning, she continued to prescribe that combination to the patient partly because the patient had not overdosed. (14-ER-2735.) She continued to prescribe another patient a comparably dangerous combination after receiving a warning letter and, in fact, increased the dose of the opioid to a high level. (14-ER-2736-41.)

She said that some patients did not want their opioid dosages tapered. (14-ER-2614-15, 2690-91.) Even so, tapering was in their best interest, but it had "maybe not been one of [her] strengths." (14-ER-2767.) She violated her clinic's patient contract, including by telling patients to go to multiple pharmacies and writing scripts for early refills. (14-ER-2726-28.)

38

She stated that she prescribed opioids to the undercover agent partly because he was addicted. (14-ER-2652-53.) And calling it the "worst choice" of her life, she admitted that she wrote opioid prescriptions for Dupuis and falsified medical records so that pharmacies would fill them. (14-ER-2648-50, 2722-23, 2781.)

### 6. The district court instructs the jury on mens rea.

The district court instructed that to find Spayd guilty of any count in the indictment, it had to conclude that she knowingly or intentionally distributed or dispensed opioids in an unauthorized manner. (15-ER-2912-13.) A prescription was unauthorized if a practitioner issued it outside the usual course of her professional practice and without a legitimate medical purpose. (15-ER-2914.) The court defined those terms as acting in accordance with a standard of medical practice generally recognized and accepted in the country. (15-ER-2914.) But a medical practitioner's own treatment methods did not themselves establish the usual course of professional practice. (15-ER-2915.)

In considering whether Spayd issued an unauthorized prescription, the jury was to examine all of her actions and the circumstances surrounding them. (15-ER-2915.) And in considering

39

whether Spayd knowingly or intentionally issued unauthorized prescriptions, the district court told the jury that it could compare Spayd's subjective beliefs with the evidence of the usual course of professional practice and legitimate medical purpose. (15-ER-2915-16.) But the court warned the jury that it could not find her guilty solely because it determined that she committed civil medical malpractice. (15-ER-2915.)

Lastly, the court defined knowingly as not acting through ignorance, mistake, or accident. (15-ER-2916.) And it defined intentionally as Spayd consciously desiring to distribute the opioids without legitimate medical purpose acting outside the usual course of her professional practice. (15-ER-2916.)

### 7. The parties close.

In its closing argument, the government told the jury that whether Spayd knowingly and intentionally distributed the opioids in an unauthorized manner was the pivotal issue. (15-ER-2926, 2932-33.) It reminded the jury that when it decided that issue, it could examine all of Spayd's actions and the surrounding circumstances, including comparing her beliefs with the evidence of the usual course of practice

40

and legitimate medical purpose. (15-ER-2933, 2935, 2937.) It pointed to testimony from Dr. King and other doctors who explained the practice of medicine, which demands physical exams, diagnostic tests, accurately diagnosing medical ailments, devising proper treatment plans beyond merely prescribing opioids, and reviewing the efficacy of those treatments. (15-ER-2937, 2939.) The government then outlined the proof that Spayd knew the standards of care, the usual course of practice, and legitimate medical purposes, and that she intentionally strayed from them. (*E.g.*, 15-ER-2926-27, 2935, 2967.)

Spayd argued that her case boiled down to what she was thinking and that it was not about malpractice. (15-ER-2973-74.) Rather, the sole issue was whether she knowingly and intentionally acted outside the usual course of practice and without legitimate medical purpose. (15-ER-2974.) Thus, the jury had to examine her "medical motive," not her "medical judgment." (15-ER-2974, 2982, 2994.) Even if other providers disagreed, and even if she conceded that she "made mistakes," that did not alter what was in her mind or in her heart. (15-ER-2979, 2997.)

In rebuttal, the government agreed that the case was not about malpractice. (15-ER-3002.) Indeed, Spayd was conscious of criminal

guilt when she fretted about the DEA to her staff. (15-ER-3002.) The jury should examine more than whether she thought that she was "doing the right thing"; it should also compare her conduct to objective medical standards. (15-ER-3003.) To make that point, the prosecutor argued that a practitioner's belief that bloodletting was in her patients' best interest would not be a defense to a criminal charge. (15-ER-3003.) Spayd had a "special obligation" to her patients. (15-ER-3006-07.) But given the doctors, pharmacists, insurance companies, and family members who warned her to stop over-prescribing, Spayd remained "on an island" in believing that she was helping her patients. (15-ER-3010-11.)

### 8. The jury finds Spayd guilty, and she is sentenced.

The jury found Spayd guilty as charged. (Dkts. 320, 321.) She was sentenced to 360 months in prison followed by three years' supervised release. (1-ER-2, 3.)

This appeal followed. (16-ER-3130.)

## SUMMARY OF ARGUMENT

This Court should affirm Spayd's convictions for unlawfully distributing drugs.

First, the district court properly allowed Dr. King's challenged testimony. Both the Supreme Court and this Court recognize the government's need to apply objective standards to convict a practitioner for unauthorized prescribing. Under this precedent, Dr. King explained the standards governing Spayd's practice and opined that she departed from them. His testimony helped the jury evaluate Spayd's mental state but stopped short of opining on the ultimate issue here: whether Spayd knowingly and intentionally prescribed opioids outside the usual course of practice and without legitimate medical purpose. Dr. King embraced this issue, but he did not substitute his judgment for the jury's in deciding it. Finally, Dr. King's brief comments conveying the magnitude of Spayd's conduct did not unfairly prejudice her. Dr. King based his testimony on his decades of professional experience and review of patient records and prescribing data. The court did not err, much less plainly err, in allowing the comments.

Second, the district court correctly instructed the jury on the mens rea. Again, precedent allows—if not requires—the government to use objective standards to convict practitioners. Thus, the court properly instructed the jury that it could compare Spayd's beliefs with objective

43

criteria in deciding whether she acted knowingly and intentionally. A practitioner's sincere belief is not a complete defense to unauthorized prescribing, and a jury is not required to accept a practitioner's belief at face value. In other words, a practitioner's sincere belief does not immunize her from criminal conviction. The court, therefore, rightly allowed the jury to examine her knowledge, intent, and conduct in light of national standards and legitimate medical purpose.

Thus, the government's closing arguments were also proper. Urging the jury to compare Spayd's beliefs with objective criteria aligned with precedent and the district court's jury instructions.

Any error here was harmless. The government presented overwhelming evidence that Spayd knowingly and intentionally prescribed opioids outside the standards of care and consciously abandoned those standards without legitimate medical reason. At its root, the evidence belied the notion that Spayd's professed beliefs were sincere.

//

//

//

44

## ARGUMENT

## I. The district court did not err in admitting Dr. King's challenged testimony.

### A. Standard of Review

This Court reviews preserved challenges to the district court's evidentiary rulings for abuse of discretion. *United States v. Perez*, 962 F.3d 420, 434 (9th Cir. 2020). To find an abuse of discretion, the court's decision must be "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). If the district court patently erred in admitting evidence, this Court may reverse only if the error materially affected the jury's verdict. *United States v. Arambula-Ruiz*, 987 F.2d 599, 605 (9th Cir. 1993).

When a defendant does not object to a witness's opinion, plain-error review applies. *Perez*, 962 F.3d at 434-35. This Court will reverse only if the district court's not intervening sua sponte was (1) error, (2) that was plain, (3) affected substantial rights, and (4) seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.*

//

//

## B. Discussion

### 1. The district court correctly allowed Dr. King to opine that Spayd prescribed outside the usual course of professional practice and without legitimate medical purpose.

Under 21 U.S.C. § 841(a)(1), it is a crime, except as authorized, for any person to knowingly or intentionally distribute or dispense a controlled substance. A practitioner is allowed to prescribe a controlled substance, and thus to distribute or dispense it, only when she acts "in the usual course of [her] professional practice" and has a "legitimate medical purpose." *Ruan v. United States*, 597 U.S. 450, 455 (2022) (citing 21 C.F.R. § 1306.04(a)). Because the regulation defines the range of a practitioner's prescribing authority by referring to those objective standards, the government may—if not must—use the same standards to prove that a practitioner knowingly or intentionally prescribed without authorization, as *Ruan* requires. *Id.* at 454, 467. Indeed, as the Supreme Court has said, the more unreasonable a defendant's claimed beliefs or misunderstandings are, especially as measured against objective standards, the more likely the jury will find that the government has proved knowledge or intent. *Id.* at 467 (citing

46

*Cheek v. United States*, 498 U.S. 192, 203-04 (1991) (quotation marks omitted)).

This Court, too, has recognized the government's need to use objective standards to convict a practitioner. *United States v. Feingold*, 454 F.3d 1001, 1007 (9th Cir. 2006) (stating that "[k]nowing how doctors generally ought to act is essential for a jury to determine whether a practitioner has acted not as a doctor, or even as a *bad* doctor, but as a 'pusher' whose conduct is without a legitimate medical justification"). And so, evidence of the applicable standard of care is "not offered to establish malpractice, but rather to support the absence of any legitimate medical purpose'" in prescribing the controlled substances. *Id.* (citing *United States v. Boettjer*, 569 F.2d 1078, 1082 (9th Cir.1978)). The "standard for criminal liability 'itself imports considerations of medical legitimacy and accepted medical standards.'" *Id.* (citing *Boettjer*, 569 F.2d at 1081).

Here, Dr. King explained the objective medical standards that governed Spayd's practice. For instance, he told the jury that standards required her to physically examine patients, learn their medical histories, and understand their mental health and other issues in their

47

lives. Based on those evaluations, she was to objectively diagnose patients, plan appropriate treatments, and decide whether those treatments were working. As for prescribing opioids to manage pain, she had to ensure that patients' function improved as their pain levels decreased. She had to guard against risks such as patients' taking opioids with alcohol and other drugs, comorbidities, addiction, overdose, and death. She, then, had to prescribe low doses for short durations while checking for and preventing potential harm.

Dr. King opined that Spayd fell far short. She prescribed opioid doses that were much too high. She did not perform adequate physical examinations and neglected to direct other forms of treatment along with opioids. She prescribed to patients who had major mental health issues. She continued to prescribe when she knew that patients had overdosed or had shown strong signs of alcohol or drug abuse. She prescribed to patients who took drugs such as Xanax or Valium. She prescribed to patients who were addicted, to patients who had not shown improved function or reduced pain levels, and to patients to support their dependency on the drugs. And when she learned that

patients died after overdosing on her prescriptions, she neglected to review her practices.

In the end, Dr. King told the jury that Spayd prescribed opioids outside the usual course of practice and without legitimate medical purpose. Both *Ruan* and *Feingold* permitted—if not required—this testimony. Thus, the district court correctly allowed it.

Contrary to Spayd's claims, *Ruan* did not shun the objective standards that Dr. King explained and applied. (AOB 19-24.) True, the Court recognized that allowing the government to convict a practitioner for falling short of an objective standard would "turn a defendant's criminal liability" on a hypothetical "reasonable" doctor's mental state, not on the defendant's. *Ruan*, 597 U.S. at 464-65. But this does not matter: It mirrors holding that the government must prove that a practitioner knowingly or intentionally acted in an unauthorized manner. *Id.* at 454. Also true, this holding expanded the scienter element in § 841. Even so, the Court reiterated that the government could prove a practitioner's mental state by measuring her actions, knowledge, and intentions against objective criteria. *Id.* at 467. Indeed, direct evidence of knowledge and intent rarely exists, so juries often

49

have to infer it using objective criteria and common sense. *See, e.g.*, *United States v. Davila-Escovedo*, 36 F.3d 840, 843 (9th Cir. 1994) ("As appellant was the driver and sole occupant of the vehicle, the jury could properly infer that he knew about the marijuana."). Dr. King therefore did not apply the wrong legal standard in assessing Spayd's prescribing.

Nor did Dr. King testify that Spayd's legal defense was illegitimate, as she claims. (AOB 23.) Rather, when Dr. King said that Spayd could not "write off" responsibility for her patients by assuming that they followed the directions on their pill bottles and that "compassion" for her patients did not excuse misbehavior, he was continuing to explain the professional standards governing Spayd's practice and opine that she deviated from them. (7-ER-1173-75, 1235-36; 8-ER-1280.) The same is true for his statement that Spayd had "no excuse" for not physically examining one of her patients who walked with a visible limp. (*Id.*)

## 2. The district court correctly permitted Dr. King to provide testimony that helped the jury consider Spayd's state of mind.

By its plain language, Fed. R. Evid. 704(a) generally allows an expert witness's testimony to encompass the issues that the jury will

ultimately decide in reaching its verdict. Those issues include, in a criminal trial, the offense elements that the government must prove to convict the defendant. In a limited exception, however, Rule 704(b) precludes the expert from opining whether the defendant "did or did not have" the mental state required to commit the offense, as "those matters are for the [jury] alone." Despite this exception, the expert may still provide testimony helpful to the jury in considering the defendant's mental state without the expert directly opining on it. This Court observed that Rule 704(b) generally "allows testimony supporting an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury." *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997) (en banc). As the D.C. Circuit stated, the Rule "commands the expert to be silent" only at the "last step in the inferential process," by forbidding him from offering an opinion "as to the defendant's actual mental state." *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988).

Here, Spayd's mental state was the ultimate issue for the jury: whether she knowingly or intentionally prescribed outside the usual

51

course of practice and not for legitimate medical purpose. Dr. King did not opine directly on that issue, much less express an opinion that Spayd was guilty; he stopped at the "last step." *Id.* Instead, he explained the standards of medical care generally and the standards for managing pain and for prescribing opioids in particular and opined that Spayd fell far short of them and acted without legitimate medical purpose. The district court, in fact, observed at a sidebar during Dr. King's testimony that the prosecutor had neither asked nor received an answer about Spayd's "subjective intent." (9-ER-1543.) What is more, the district court instructed the jurors that it was their job to decide whether to give Dr. King's opinions any weight. (15-ER-2909.) The jury, then, with Dr. King's testimony and the court's instruction in mind, was free to decide whether Spayd had the requisite mental state absent King telling them "what result to reach." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017). Thus, the jury concluded that she knowingly or intentionally prescribed outside the usual course of practice and without legitimate medical purpose—not Dr. King.

To be sure, Dr. King's testimony embraced ultimate issues and touched on Spayd's knowledge. But the statements that Spayd

challenges were not error under Rule 704(b). (AOB 28-31.) His summarizing how practitioners remain aware of current practice standards and attend required training were general and not specific to Spayd. Thus, they were inferentially relevant to her mental state but not a direct opinion on it. The same is true of his assertion about inferring a practitioner's state of mind from the medical charts. Similarly, Dr. King's identifying the many times that Spayd prescribed opioids knowing that her patients had overdosed, took or abused other drugs, showed signs of mental illness, abused the opioids that she prescribed, were experiencing disruptions in their lives, and so forth, too, were relevant to inferring her mens rea. But this and other testimony did not require the jury to find that Spayd knowingly or intentionally prescribed her patients opioids outside the usual course of practice and without legitimate medical purpose. "Rule 704(b) does not preclude an expert from testifying to a predicate matter, even if the jury might infer the necessary mens rea from such testimony, so long as the testimony as to the predicate matter does not necessarily imply the mens rea element." *Morales*, 108 F.3d at 1033.

53

This Court's decision in *Diaz* does not help Spayd. (AOB 33.) There, like Dr. King, an expert testified for the government that the defendant wrote prescriptions outside the usual course of medical practice and without a legitimate purpose. *Diaz*, 876 F.3d at 1196. And also, like Dr. King, he did not substitute his judgment for the jury's. *Id.* at 1199. Although Dr. King identified what Spayd knew about her patients based on her records, a predicate matter, he did not take the final step of instructing the jury to conclude that she had the requisite mens rea and to find her guilty. For that reason, the other case that Spayd cites, *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), does not help her either.

Lastly, Spayd believed that the Supreme Court in *Diaz v. United States*, 144 S. Ct. 1727 (2024), would prohibit an expert from making the "functional equivalent" of a comment on a defendant's mens rea. (AOB 38.) Not so. Instead, in a drug trafficking trial in which the defendant claimed that she was unaware of drugs concealed in a car she drove, the Court ruled that Rule 704(b) permitted an expert witness for the government to opine that "most drug couriers know that they are transporting drugs." *Diaz*, 144 S. Ct. at 1730.

54

In brief, Dr. King did not substitute his judgment of Spayd's mental state for the jury's.

### 3. The district court did not err, much less plainly err, in letting Dr. King convey the magnitude of Spayd's conduct.

Testimony is relevant if the district court determines only that it has "any tendency to make a fact more or less probable than it would be without the evidence," and that fact must be "of consequence in determining the action." Fed. R. Evid. 401. At the same time, the district court may exclude relevant testimony if its probative value is "substantially outweighed" by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In short, the rule "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Haischer*, 780 F.3d 1277, 1282 (9th Cir. 2015). Because this Court grants "special deference" to the district court's weighing relevance against prejudice, "it is the rare exception" that the court's decision to allow testimony under Rule 403 was plain error. *United States v. Rizk*, 660 F.3d 1125, 1132 (9th Cir. 2011).

55

Here, Dr. King's statements that Spayd now challenges were properly before the jury. His brief comments that he had to reformat his summary to capture the many warning signs that should have dissuaded Spayd from prescribing opioids, that he also had to reformat it to capture one patient's many refill requests, and that he was "somewhat appalled" by her prescribing to another patient conveyed how far Spayd strayed from the usual course of practice. (AOB 40-41.) Likewise, his minor comments on two photos taken after J.L.'s overdose death also expressed the severity of Spayd's conduct. (AOB 41-42.) Dr. King based each of those comments on his professional experience and education, and they aided the jury in understanding the evidence and in deciding whether Spayd prescribed in the usual course of practice without legitimate medical purpose. *See* Fed. R. Evid. 702. The district court, therefore, did not abuse its discretion in allowing them.

Even if the district court erred, the error was not "clear or obvious under current law." *United States v. Gonzalez-Becerra*, 784 F.3d 514, 518 (9th Cir. 2015). Spayd cites no precedent for not extending deference here. Nor did any error affect her substantial rights, as she cannot demonstrate that it altered the outcome of her trial. *See Puckett*

*v. United States*, 556 U.S. 129, 135 (2009). The evidence of her guilt was overwhelming, and the now-challenged testimony was only a handful of lines in a multi-week trial. For the same reasons, Spayd cannot show that allowing the testimony was a "miscarriage of justice" warranting the "'extravagant protection'" of correction under plain-error review. *See United States v. Young*, 470 U.S. 1, 15-16. (1985).

And so, there was no error, much less plain error, here.

### 4. Any error was harmless.

Any error in allowing Dr. King's challenged testimony did not materially affect the jury's verdicts. *See Arambula-Ruiz*, 987 F.2d at 605. The government presented overwhelming evidence that Spayd knowingly and intentionally prescribed opioids without authority, even aside from Dr. King's opinions. The usual practices for managing pain were well established, and Spayd learned and knew them. She admitted that she knew them, and her clinic protocols such as patient contracts and urinalysis tests reflected that she knew them. She received myriad warnings from medical doctors, pharmacies, and insurance companies. And she never professed a lack of awareness or a misunderstanding. Rather, she was conscious that she abandoned those standards for no

legitimate medical purpose. She falsified medical records to mask her actions, fretted about the DEA and committing a felony, and feared going to jail. The jury, then, found Spayd guilty based on her knowing and intentional conduct.

In sum, the district court correctly allowed Dr. King's challenged testimony. But even if the court erred, the error did not change the outcome of the trial, as the evidence of Spayd's guilt was overwhelming.

## II. The district court correctly instructed the jury on the mens rea required to find a practitioner guilty of unlawfully distributing drugs.

### A. Standard of Review

This Court reviews the district court's formulation of jury instructions for abuse of discretion but reviews de novo whether those instructions correctly stated the elements of the offense and adequately covered the defendant's theory of the case. *United States v. Liew*, 856 F.3d 585, 595-96 (9th Cir. 2017). "[T]he relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Anderson*, 741 F.3d 938, 947 (9th Cir. 2013). An error in misstating an offense element is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found

58

the defendant guilty absent the error." *United States v. Thongsy*, 577 F.3d 1036, 1043 (9th Cir. 2009).

**B.     Discussion**

**1.     The district court properly instructed the jury.**

The district court instructed the jury that to find Spayd guilty, it must find that she knowingly or intentionally distributed or dispensed the opioids without a legitimate medical purpose and outside the usual course of her professional practice. In weighing her knowledge and intent, the court told the jury that it could compare Spayd's subjective beliefs with the testimony describing the usual course of professional practice and legitimate medical purpose. Those instructions were proper.

As discussed above, both the Supreme Court and this Court have recognized the government's need to establish and refer to objective medical standards to convict a practitioner. The range of a practitioner's prescribing authority refers to this criteria, so the government may—if not must—resort to the same criteria to prove that a practitioner knowingly or intentionally prescribed without authority. *Ruan*, 597 U.S. at 454, 455, 467 (citing 21 C.F.R. § 1306.04(a)). The more

59

unreasonable a defendant's claimed beliefs or misunderstandings are, especially as measured against objective standards, the more likely the jury will find that the government has proved knowledge or intent. *Id.* at 467 (citing *Cheek v. United States*, 498 U.S. 192, 203-04 (1991) (quotation marks omitted). Likewise, this Court stated that "[k]nowing how doctors generally ought to act is essential for a jury to determine whether a practitioner has acted not as a doctor, or even as a *bad* doctor, but as a 'pusher' whose conduct is without a legitimate medical justification"). *Feingold*, 454 F.3d at 1007. Evidence of the applicable standard of care is "not offered to establish malpractice, but rather to support the absence of any legitimate medical purpose" in prescribing the controlled substances. *Id.* (citing *Boettjer*, 569 F.2d at 1082). The district court, then, properly told the jury that it could assess Spayd's prescribing in light of the usual course of practice and legitimate medical purpose.

Spayd's claim that her sincere beliefs in her prescribing negate finding knowledge and intent, even if those beliefs are absurd, fails. (AOB 47-48.) The Court in *Ruan* did not state that a sincere belief was a complete defense to a § 841 prosecution. Nor did the Court declare

60

that the absurdity of a practitioner's belief was off-limits to a jury's scrutiny. Instead, in addressing the government's warning of "bad-apple" prescribers "escap[ing] liability by claiming idiosyncratic views," the Court responded that the government could prove knowledge and intent via circumstantial evidence, including using objective standards to judge those beliefs. *Ruan*, 597 U.S. at 467. Finally, the Court reasoned that applying § 841's mens rea to the statute's authorization clause would help diminish the risk of "punishing acceptable and beneficial prescribing that lies close to, but on the permissible side of, the criminal line." *Id*. at 459. In fact, "we expect, and indeed usually want, doctors to prescribe the medications that their patients need." *Id*. Nowhere in *Ruan* did the Court suggest that it sought to move the "criminal line" to allow practitioners, safe from prosecution behind their sincere beliefs, to knowingly fuel addiction, overdose, death, and ruin, as Spayd's misreading of *Ruan* would. In short, the jury did not have to accept Spayd's word, much less accept it in the face of contrary proof.

*Cheek* does not help Spayd. (AOB 49-50.) Willfulness is not the mens rea in § 841 or in Spayd's other offenses of conviction. Of course, the Court in *Ruan* grappled with the scienter in § 841 and, as noted

61

above, even briefly cited to *Cheek. Ruan*, 597 U.S. at 467 (citing *Cheek*, 498 U.S. at 203-04). But it did not extend *Cheek's* willfulness to Spayd's offenses. Instead, the Court crafted a scienter unique to the medical community that seeks to separate legitimate prescribing from pill pushing. Willfulness, in contrast, is "special treatment" for the "average citizen" struggling to "know and comprehend the extent of the duties and obligations imposed by the [complexity of the] tax laws." *Cheek*, 498 U.S. at 199-201. When Spayd prescribed opioids to her patients, she was not an average citizen wrestling with her income tax forms; she was an educated, licensed, and trained practitioner counted on to be mature and trustworthy in a highly regulated field. Thus, the extra protections in criminal tax cases do not apply to Spayd (or to any other prescriber), and the district court rightly instructed the jury that it could compare her beliefs to objective standards.

Lastly, the court's using "subjective beliefs" in the instruction is of no moment. Contrary to Spayd's claim, there is no meaningful difference between "asserted beliefs" and "subjective beliefs" at trial. (AOB 47-51.) Spayd's "subjective beliefs" encompassed all the presented testimony and other evidence about her prescribing, including her

assertions from the witness stand. Again, the jury never had to accept her beliefs at face value; instead, its role under *Ruan* and *Feingold* was to examine them, including their sincerity, in light of objective standards.

### 2. Any error was harmless.

The instructions were adequate to guide the jury's deliberation, including its evaluation of Spayd's defense. *See Anderson*, 741 F.3d at 947. As discussed above, the evidence that Spayd knew the standards of care and consciously abandoned them for no legitimate medical purpose was overwhelming. At bottom, the evidence belied the notion that Spayd's professed "beliefs" were "sincere." For instance, she knowingly falsified prescriptions and fabricated medical records to distribute opioids to Dupuis (and likely herself). When confronted by the pharmacist who spotted it, she denied it before begging him not to call the DEA. She also knew that she prescribed dosages to her patients that were too high. When she surmised that the pharmacist might indeed call the DEA, and thus that the DEA might review her prescribing, she began tapering her patients. She knew, too, that she wrote unlawful prescriptions to the undercover agent to satisfy his

addiction. She told him that she should not have done it and that she could go to jail for it. Indeed, she knew that she practiced outside the usual course and not for legitimate medical practice. She fretted about the DEA and asked her staff whether they thought that new patients were undercover agents. She had a guilty state of mind.

Thus, the jury would have found Spayd guilty absent any error in the instructions. *See Thongsy*, 577 F.3d at 1043.

## III. The government's closing arguments tracked the law and the instructions.

### A. Standard of Review

Generally, this Court reviews for abuse of discretion a district court's decision to overrule an objection raised during closing argument. *United States v. Navarro*, 608 F.3d 529, 532 (9th Cir. 2010).

### B. Discussion

The prosecutors did not misstate the law. As discussed above, the district court properly instructed the jury that it could compare Spayd's beliefs with objective criteria. And so, the prosecutors urged the jury to do just that. In reminding the jury to examine Spayd's conduct in light of practice standards, they were tackling claims that her prescribing reflected her care, compassion, and belief that she was "doing the right

64

thing." (15-ER-3003.) "Prosecutors have considerable leeway to strike hard blows based on the evidence and all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000). Here, the prosecutors acted well within that leeway and consistently with both *Ruan* and *Feingold*.

Any impropriety in the argument did not prejudice Spayd. *See Navarro*, 608 F.3d at 535-36. As noted above, the government presented overwhelming evidence that she knowingly and intentionally prescribed opioids without authority. The evidence also belied her claims that her beliefs to the contrary were sincere. The jury thus had ample evidence to find Spayd guilty based on her knowing and intentional acts.

## IV. The district court did not err, much less cumulatively err.

### A. Standard of Review

To show cumulative error warranting reversal, a defendant must establish multiple errors that collectively prejudiced her. *United States v. Macias*, 789 F.3d 1011, 1023-24 (9th Cir. 2015). When there is "ample evidence of [a defendant's] guilt," this Court has not reversed for cumulative error. *United States v. Wilkes*, 662 F.3d 524, 543 (9th Cir. 2011).

65

## B.    Discussion

Because Spayd has not established any error, let alone multiple errors, and because the evidence of her guilt was overwhelming, this Court has no reason to reverse for cumulative error.

## CONCLUSION

This Court should affirm the district court's judgment and Spayd's convictions.

RESPECTFULLY SUBMITTED August 26, 2024, at Anchorage, Alaska.

> S. LANE TUCKER
> United States Attorney
>
> *s/ Stephen L. Corso*
> STEPHEN L. CORSO
> Assistant United States Attorney
> 222 West 7th Avenue, #9, Room 253
> Anchorage, AK 99513-7567
> Telephone: (907) 271-5071
> Fax: (907) 271-1500
>
> *Attorneys for Appellee*
> United States of America

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 23-1303

The undersigned attorney or self-represented party states the following:

( • )   I am unaware of any related cases currently pending in this court.

( )   I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( )   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Stephen L. Corso    **Date** | Aug 26, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**      *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-1303

I am the attorney or self-represented party.

**This brief contains** 11,855 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Stephen L. Corso      **Date** 8/26/2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*